# EXHIBIT "D"

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON AT TACOMA

OFFICER NAVIN SHARMA,                       )
                                            )
        Plaintiff/Counterdefendant,         )
v.                                          )No. C06-5688BHS
                                            )
CITY OF VANCOUVER, a Washington             )
municipal corporation, et al.,              )
                                            )
        Defendants/Counterclaimants.        )
                                            )

VIDEOTAPED DEPOSITION OF

MITCHELL BARKER

Taken in behalf of Plaintiff

\*   \*   \*

June 2, 2008

1104 Main Street

Vancouver, Washington

Priscilla (Pia) Harris, CSR-RPR
Court Reporter

Q     (By Mr. Blankenship) You -- so it's your testimony that he was intentionally inserting lies into the report? Is that your testimony, sir?

A     My testimony is that I think he was intentionally inserting untruthful statements into the reports.

Q     And so -- let me make sure I understand that.  You believe -- when you say intentionally inserting, what do you mean by that?

A     I mean with intent to place a statement in a report, he did so.

Q     You mean like volitionally, like he put something in a report, physically did it and -- is that what you're saying?

        MR. LLOYD:  Object to the form of the question.

Q     (By Mr. Blankenship) Let me back up a little bit. Are you -- are you contending that he knew that there were inaccuracies, and then put them in the report intentionally?

        MR. LLOYD:  Compound question.

        Go ahead and answer.

        THE WITNESS:  To the first part of the question -- could you repeat the question?

Q     (By Mr. Blankenship) Let me break it down, even though I don't think it's compound, it might be simpler.

A     Okay.

Q     Do you believe that he was intentionally inserting

inaccuracies into police reports?

A    I think he intentionally inserted specific phrases into a report in order to bolster the report, and that those statements were not true.

Q    Okay.  And do you -- I understand that's your testimony.  And what you're saying there, tell me if I'm wrong, is that you believe he was putting these phrases into the report to make them look better; is that right?

A    Yes.

Q    My next question is:  Do you believe that Officer Sharma knew that the statements weren't accurate when he inserted them into the report?

MR. LLOYD:  Objection; calls for speculation.

Go ahead and answer.

THE WITNESS:  I think he would have had to, because the statements state something that he did when, in fact, he didn't do those things.

Q    (By Mr. Blankenship) You think he would have had to.  And what specific statements are you referring to?

A    Well, the one that troubled me the most and that -- there were a lot of issues and a lot of mistakes in things, and I'm sure we'll discuss those, but he took from another officer's report a set of phraseologies about things he had done while operating a BAC Verifier, which, in fact, he had not done, said he had not done in his interview

think, about the operation of the machine?

MR. LLOYD: Objection; misstates prior testimony. You're getting argumentative.

Go ahead and answer.

THE WITNESS: I don't know if I would have or not, but if I would put facts into the report, they would have been true facts.

Q (By Mr. Blankenship) Isn't it true that that paragraph wasn't even necessary as part of a police report at all?

A That's true.

Q And that the report would have stood on its own without any description of how the BAC machine worked?

MR. LLOYD: Objection; calls for a legal conclusion.

THE WITNESS: I don't know how to answer that as it relates to the possible revocation hearing because I haven't been to one of those for some time. It may or may not bear on that, I don't know.

Q (By Mr. Blankenship) Fair to say that you yourself are not an expert on how the BAC machine works, are you?

A I am not.

Q And do you know whether or not there's a printout that would document whether or not the BAC machine functioned properly?

A    I do know that there is.

Q    And isn't it true that the printout would contain accurate information about how the machine operated?

A    I don't -- I don't know that the -- I don't know that it would give me information about how the machine operated, but generally, it would -- it would print the relevant information, although a lot of that is input by the officer.

Q    And are you contending in this case that Officer Sharma wasn't inputting the proper data in the machine?

MR. LLOYD:  Objection; vague, ambiguous.

Go ahead.

Q    (By Mr. Blankenship) Let me ask it this way:  When you were firing Officer Sharma, part of the process leading up to firing him, did it involve some type of determination, one way or the other, whether or not Officer Sharma was properly operating the BAC machine?

MR. LLOYD:  Objection; vague.

Go ahead and answer.

THE WITNESS:  Whether he was properly operating -- I'm sorry, I don't -- I don't know that I'm understanding the question.

Q    (By Mr. Blankenship) Was part of your inquiry to determine whether or not Officer Sharma was, in fact, properly operating the BAC machine?

MR. LLOYD: Same objection.

THE WITNESS: Apparently not, or I'm just still not understanding what you're asking.

Q     (By Mr. Blankenship) I didn't see anything in the record that contained any analysis of whether or not he was properly operating the machine. So I'm asking you if that was something that wasn't documented or something that you considered outside of -- or as part of the investigation.

MR. LLOYD: Again, vague.

Go ahead.

THE WITNESS: We -- I guess we didn't look at that. I'm not sure, again, I understand what you're talking about by operating -- if he was properly operating it.

Q     (By Mr. Blankenship) Would it surprise you if Commander Kistler testified that she did not have any conclusions in her mind as to whether or not Navin Sharma had any intent to deceive in connection with his reports?

MR. LLOYD: Objection; incomplete hypothetical.

Go ahead.

THE WITNESS: Was your question would it surprise me?

Q     (By Mr. Blankenship) If -- Nannette Kistler testified, the question: Did you make any type of conclusions in your own mind after you submitted your recommendation with regard to Navin Sharma having any intent

to deceive in connection with his report?

And the answer was, No.

MR. LLOYD: Same objection.

THE WITNESS: The question was, would that surprise me?

Q (By Mr. Blankenship) Yeah.

A No, it would not.

Q What was her role on this investigation?

A Well, initially she took the complaint and did the preliminary review of a subset of reports. I think the complaint was that Officer Sharma was recycling reports, and she did the initial evaluation to look at those reports.

Following that evaluation, she advised me that she thought it should go to the professional standards unit for further investigation. She handed it off at that -- excuse me -- at that point.

Q Who did you assign to this investigation of Navin Sharma that had any experience --

Let me ask it this way: Was anyone involved with this internal investigation of Navin Sharma who was a traffic cop?

A Who at the time was a traffic cop?

Q Yeah.

A No.

Q And were there any people that had experience as

disclose unless, at the time we have an open investigation, there's a concurrent case related to it.

Q     (By Mr. Blankenship) But if I understand the way you're defining it is if an officer may have to testify in a case and there's something that that officer did, whether or not they agree that they did it, involves some type of impeachment information that could show dishonesty or credibility, you believe you have to disclose them?

MR. LLOYD:  Incomplete hypothetical.

Go ahead and answer.

THE WITNESS:  No, I'm talking about a sustained finding, where we have to disclose sustained findings.

Q     (By Mr. Blankenship) Okay.  So in the situation with Officer Sharma, had the finding not been sustained, you wouldn't have to disclose it; correct?

A     I think that is so.          •

Q     And so a Brady letter, in your opinion, would only go out after there was a sustained finding?

MR. LLOYD:  Objection; incomplete hypothetical.

Go ahead and answer.

THE WITNESS:  Or -- and this is emerging all the time, that's one of the problems we have with a 40-year old ruling, it tends to emerge almost by the week now.

If we were in the middle of an investigation, my understanding is we would also disclose with the

Q I could -- I'll have to do that after a break.

A Okay.

Q I don't have that with me.

A Okay.

Q Paul Fisk, Howard Anderson, John Steigleder, they were all Caucasian males; correct?

A That is my belief. I never met John Steigleder, but I believe that's so.

Q Did you refer Navin Sharma's case to the Washington State Criminal Justice Training Commission?

MR. LLOYD: Objection; vague and ambiguous as to "refer case."

THE WITNESS: We sent a letter that is required when we hire -- when anyone is hired or leaves employment to the CJTC, and I believe then they would have asked for -- and maybe they didn't -- they would have asked for the file pertaining to that.

(Deposition Exhibit 4 was marked for identification.)

Q (By Mr. Blankenship) Handing you what has been marked as Exhibit 4. Is that your signature?

A Yes.

Q Is this a true and correct copy of that letter that you sent to the Washington State Criminal Justice Center relating to Navin Sharma?

A    It appears to be, other than the redactions.

Q    And you signed that on 10/3/2006; is that right?

A    That's -- yes, that's what it shows here.  That date may be off by a day or so.

Q    And is that the same -- is it based on the same RCW that was referenced in the letter to the prosecutor?  Is it the same section?

A    Is what --

Q    Remember the letter to the prosecutor that was Exhibit 3?

A    Yes.  I don't understand your question.

Q    Is it just the same basis, section 43.010?

A    Yeah, in section 3, yes.  It says, "Is the agency aware of conduct that may violate the RCW"; and, yes.  And it goes to that subsection that we discussed, 7(b).

Q    So that would be -- that would be that little (b), "Conduct that would constitute any of the crimes addressed in (a) of the subsection"; is that right?

A    Yes.

Q    And did you discuss this with Debra Quinn, sending this out?

A    You know, I -- I can't say I didn't.  I don't specifically recall that I did.  I do recall discussing it with Terry.  And I'm not sure why that would be, but -- so it may have been with both of them.  I know I discussed it

with Terry Weiner.

Q    Was it your idea or their idea to send this out?

A    It was my idea.

Q    And could this, in fact, result in an officer losing his certification to act as a law enforcement agent?

A    It could in Washington State.

Q    And did you think that would be appropriate for Navin Sharma to lose his ability to act as a law enforcement agent when you terminated him?

MR. LLOYD:  Object to the question, form.

Go ahead.

THE WITNESS:  I think it's required under the processes we have in place with law enforcement officer's certification.  So, in that respect, I think it was appropriate and it's required with the findings.

Q    (By Mr. Blankenship) Anyone else that you know that had that sent out on them, this letter, notice disqual -- you know, Exhibit 4?

A    Ever or VPD or --

Q    VPD.

MR. LLOYD:  Are you talking about the "yes" box checked.

MR. BLANKENSHIP:  "Yes" box checked.

MR. LLOYD:  Okay.  Or ever?

THE WITNESS:  There are some, and I'm not going to

have an inclusive list of those people, but --

Q    (By Mr. Blankenship) And, you know, "yes" box -- yeah, "yes" box checked would be disqualifying conduct; right?

A    Yeah, possible disqualifying conduct.

Q    May violate?  Okay.

A    Yes.  There are others.  I don't know that I could give you an accurate list right now.

Q    Who do you recall this going out on?

A    Well, I don't -- I would imagine on Officer Hogan, but I don't know if it was sent out.  Officer -- excuse me -- Lieutenant Anderson; Lieutenant Luse; obviously, Officer Sharma, Officer Nowak.

I'm sorry, if I had a list of people that had left the agency since I've been here -- there may be others.  I'm missing some, I presume.

Q    What about Anderson, was the box checked yes or no?

A    I believe it was checked yes.  I'm sorry, Officer Dave Cowsert.

Q    Cowsert?

A    Cowsert, C-O-W-S-E-R-T.

Q    You said you believe the box was checked yes for Anderson; is that right?

A    Yes.

Q   Why do you believe that?

A   I don't know how to answer that, exactly.  I -- I guess -- I don't know whether it was or not, so I'm supposing it was.

Q   Were you in charge of sending that out?

A   No, I don't believe so at that time.

Q   Were you consulted about that being sent out?

A   I would imagine I was.

(Deposition Exhibit 5 was marked for identification.)

Q   (By Mr. Blankenship) Handing you what has been marked as Exhibit 5.

A   Uh-huh.

Q   Which appears to be a termination/separation Washington State Criminal Justice Training Commission letter.  Do you see that?

A   Yes.

Q   And is this a true and correct copy?

A   Other than the redaction.  Well, I shouldn't say that.  I'm not sure I've seen this, but it appears to be the document that would have been in use at that time.

Q   And it appears that it's marked -- the box marked here is "Termination with cause not constituting disqualifying misconduct"; right?

A   Yes.

A     I don't know that it was.  That's the only explanation I can come up with here, if I have to speculate why this box was checked.

Q     Do you know what Lieutenant Anderson's doing now, where he's working?

A     I don't.

Q     Do you have any idea whether he's working in law enforcement?

A     I haven't seen him since he left the agency.

Q     What was your role in his internal investigation?

A     I did the review of the entire file and made a recommendation to the chief of police.  Because my recommendation was termination, I couldn't impose finding -- excuse me -- I couldn't impose that discipline.

Q     So you did what Lieutenant Russell did in Navin Sharma's case, essentially?

MR. LLOYD:  Objection; assumes facts not in evidence, misstates the record.

Q     (By Mr. Blankenship) Were you the investigating officer?

A     No.  I did exactly as I did in Officer Sharma's case, I reviewed the final documentation in this -- with Lieutenant Anderson, I was the assistant chief, in the determination with Officer Sharma I was in the acting chief's role, so I had the authority to terminate.  In this

Lieutenant Russell and Commander Kistler, or Terry Weiner or Quinn or Gathe, did any of those people express any opposition to Officer Sharma being terminated?

A     Lieutenant Russell was concerned about the outcome of that action.  The other people you mentioned, no one -- I had no one come to me and say, This was the wrong finding, you're going down the wrong path, this is excessive, you shouldn't do it, but Lieutenant Russell was concerned.

Q     And when did he voice those concerns to you?

A     When we -- when I was in the decision-making process after having received the file.

Q     And what did he tell you?

A     He said that I would be sued and the agency would be sued, and it was going to be very difficult for everyone.

Q     Did he also tell you that he was -- personally thought that the -- that termination was too harsh of an outcome for the -- for the acts alleged?

MR. LLOYD:  Objection; assumes facts not in evidence.

THE WITNESS:  I remember him telling me he didn't think I had any other choice with the findings I made, but that it would be very bad for the agency as a whole, and for me and others personally, to proceed in that way.

Q     (By Mr. Blankenship) And did he give you any basis for that?  Did he say anything else?  I mean, I would

(Deposition Exhibit 6 was marked for identification.)

Q     (By Mr. Blankenship) I'm handing you what has been marked as Exhibit 6.  Do you recognize this document?

A     Yes.

Q     What is it?

A     It's the notice of findings to Officer Sharma on this investigation.

Q     And did you review this with anyone prior to sending it?

A     Yes.

Q     Who did you review it with?

A     Probably Terry Weiner, but it might have been Debra, as well.  I don't recall.

Q     Did you review it with anyone else?

A     I don't recall.

Q     And do you recall -- so you don't remember whether or not it was Terry or Debra that you reviewed this with; is that right?  You don't remember which one of the city attorneys you reviewed this with?

A     Or both.  I think it was Terry Weiner, but I just can't tell you that with certainty.

Q     And did you discuss your findings with them before you made that finding?  I mean, before you made a sustained finding for statements and false statements, sustained

(Deposition Exhibit 7 was marked for identification.)

MR. BLANKENSHIP:  Let's change the tape.

(Recess was taken.)

Q    (By Mr. Blankenship) Is this a true and correct copy of the letter that was sent by you and signed by you to Art Curtis and Ted Gathe?

A    Yes, it is.

Q    And under your signature, on the second page, shows that it was sent to Jim Miller, the Clark County Prosecuting Attorney, Kevin McClure, the Vancouver City Attorney, Debra Quinn, and Scott Creager; is that right?

A    Yes.

Q    And was this the first one of these you'd ever sent out --

MR. LLOYD:  Object --

Q    (By Mr. Blankenship) -- at the Vancouver Police Department?

MR. LLOYD:  Object to form.

Go ahead.

THE WITNESS:  I believe it is.

Q    (By Mr. Blankenship) Have you sent any others of these out after Mr. Sharma was terminated?

A    Not that I recall, as I sit here.

Q    Why did you send this out?

A     Well, again, because I believed we had issues that would have to be disclosed in cases that were pending or were active where Officer Sharma was a witness.

Q     And did you consult Debra Quinn or Terry Weiner or Ted Gathe on this before you sent it out?

A     Probably with Terry Weiner.

Q     Did he draft this, or did you?

A     I'm sorry?

Q     Did he draft this, or did you draft it?

A     I don't believe -- I don't believe I drafted this. I can't -- I can't say that I didn't now, or I might have drafted it and had it, but somebody either drafted it for me or reworked it after I had done an initial draft.  I'm -- I'm remembering that it's Terry, but that may not be accurate.

Q     Did you receive a response from Art Curtis on this?

A     From his office, yes.

Q     And you asked to -- before that, is it -- let me hand you this.

(Deposition Exhibit 8 was marked for identification.)

Q     (By Mr. Blankenship) Do you recognize what this is, No. 8?

A     Well, it -- it's the letter -- it's -- I don't,

actually. It's the letter, obviously, you just handed me on a computer screen with --

Q    It appears the author is Debra Quinn?

MR. LLOYD: Object; this lacks foundation.

Go ahead.

Q    (By Mr. Blankenship) Does that refresh your recollection?

A    No --

MR. LLOYD: Maintain the objection; lacks foundation.

Q    (By Mr. Blankenship) Do you see where it says "Author: Debra Quinn"?

A    I don't. If you can tell me where it is. I'm sorry.

Q    Right here.

A    Oh, I'm sorry. Yes, yes.

Q    And is that how letters are written? I mean, do you know what that is?

A    Do I know what what is?

Q    This little box, this little properties box?

A    I don't, actually. I don't use whatever that is when I'm drafting letters.

Q    But that's consistent -- if it was Debra Quinn, that would be consistent with your recollection that somebody drafted this for you; right?

MR. LLOYD:  Objection; calls for speculation and misstates prior testimony.

THE WITNESS:  Yeah, I think I didn't recall Debra drafting this.

Q     (By Mr. Blankenship) I think you said you thought it was Terry Weiner; right?

A     I thought it was Terry Weiner.

Q     Okay.  But it wasn't something that -- you think -- you think that one of the City Attorneys drafted this for you, and you're not sure whether or not it was Terry Weiner or Debra Quinn?

A     Yes.

Q     Okay.

(Deposition Exhibit 9 was marked for identification.)

Q     (By Mr. Blankenship) You testified earlier that you got a response from Art Curtis?

A     From his office.

Q     Okay.  And this appears to be from James Miller?

A     Yes.

Q     All right.  And Art Curtis, Ted Gathe, and Kevin McClure are cc'd on this; correct?

A     Yes.

Q     Is this a true and correct copy?

A     It appears to be, yes.

could go forward with prosecution.

Q    Did you ever have any conversations with James Miller about this?

A    About the letter?

Q    Yeah.

A    I --

Q    Or about Officer Sharma?

A    I don't -- I don't believe so.

(Deposition Exhibit 10 was marked for identification.)

Q    (By Mr. Blankenship) Handing you what has been marked as Exhibit 10, which appears to be a copy of a letter from Snyder & Hoag, the lawyer for the Guild.

A    Yes.

Q    And is this a true and correct copy?

A    As far as I can tell, it is.

Q    Appears your office received this on August 30th, 2006?

A    Yes.

Q    And did you review this letter carefully?

A    Yes.

Q    And did you review it with anyone?

A    I reviewed it initially when I received it.

Q    Okay.

A    I would think that I reviewed it with, again,

either -- I believe Terry, but it might have been with Debra Quinn, or both of them.  By "reviewing" you mean discussed?

Q   Right.

A   Yes.

Q   And there's a reference in the first paragraph to a Loudermill hearing.  Do you see that?

A   Yes.

Q   You sent the letters to the prosecutor prior to the -- prosecutors prior to any Loudermill hearing, didn't you?

A   Yes.

Q   And what is the importance of a Loudermill hearing?

A   It's for an officer to bring forward any other information they want considered in the ultimate decision on discipline, if any, the imposition of discipline, if any.

Q   And why didn't you wait until after a Loudermill hearing to notify the prosecutors?

A   Because I wanted to know what the impact of my find -- the findings -- a Loudermill does not change sustained findings, or rarely does it.  It's not the purpose of a Loudermill.  A Loudermill is for the officer to bring information forward to consider for imposition of dis -- any discipline.

Q   I want you to take a look at the third paragraph,

which reads, "Officer Sharma has worked for the Vancouver Police Department for approximately nine and a half years."

Is that a true statement?

A    I believe it is at this -- at that time.

Q    "When the Department saw fit to do evaluations, the ones he received were highly positive and were from those most familiar with his work:  His immediate supervisors."

Do you agree with that statement?

A    Yes.

Q    "He has never been subject to discipline."

Do you agree with that statement?

A    Yes.

Q    "He has received awards, almost too many to list."

Do you agree with that statement?

A    He's received a lot of awards, yes.

Q    And it says, "Including, but not limited to the Clark County DUI Task Force Exceptional Law Enforcement Award for Outstanding DUI and Traffic Enforcement in 2003, 2004 and 2005."

Were you aware of that?

A    I probably was at this time.  I don't independently recall it now.

Q    He goes on to write, "He has received numerous compliments from the City Attorney's Offices for his work on

Basically, it seems like a lot of the gist of his letter -- let's look at paragraph 1 where he's -- where he's rebutting your -- your letter.

He says, "There is no evidence whatsoever in the record that Officer Sharma intended to make any statement that was inaccurate."

Do you see that?  It's the last sentence.

A     I'm sorry, first paragraph?

Q     Second page.

A     Okay.

MR. LLOYD:  No. 1.

Q     (By Mr. Blankenship) No. 1.

A     Got it.

Q     He says, "If every officer who made a statement in a police report that was later determined to be inaccurate were told that he or she falsified a document, or somehow committed perjury, the Vancouver Police Department would be significantly smaller in size."

Would you agree with that statement?

A     Yes.

Q     He goes on to write, "The Guild also notes with some cynicism, that while you started out quoting that statement, he had to conclude at the end of that page, that there is no evidence whatsoever in the record that Officer Sharma intended to make any statement that was inaccurate."

Q    But you would agree that if the machine -- that the machine wouldn't have functioned -- if the machine wasn't working properly, it wouldn't have produced a printout?

A    Correct.

Q    But you're saying you don't believe that he performed any of the steps that led up to it?

MR. LLOYD:  Misstates prior testimony.

Go ahead.

MR. BLANKENSHIP:  I'm not trying to misstate anything.

Q    (By Mr. Blankenship) And I know it's somewhat confusing, I'm not trying to be.

A    No, that's -- nor am I.  I'm trying to make sure I understand your question.

My contention, in general, and I don't mean to keep coming back to this, is that the approximate three paragraphs, the phraseology that was taken from another officer's report was put into a number of reports by Officer Sharma where there was no way to determine if he took those steps.

And my understanding, when I read his interview clearly was, that he hadn't taken the steps, that he didn't know exactly what that meant, that he wasn't a technician, he didn't understand the BAC.  I put that in there.  So I do

as nonresponsive.

MR. LLOYD:  Motion denied.

MR. BLANKENSHIP:  You're stealing my --

Q    (By Mr. Blankenship) He writes -- he says, "In addition, the machine prints out the temperature from the internal check when it gives a breathalyzer reading.  If this is such a critical step, the Vancouver City Attorneys who prosecuted his cases should have easily caught it, as should have his supervisors."

Do you agree with that statement?

A    I think someone along the line should have caught this.  Can I make a correction here?

Q    Yeah, you may.

A    We threw out -- and I had the same error, and Mr. Hoag does, and I think -- this term "temperature," and that's what's confusing me a little bit -- we've used this term temperature of the external sample, and it isn't.  It's a value.

So the temperature has to do with the breath tube and holding that warm to the touch, but this term -- and through this whole case, all of us, I think, have used this term external standard temperature, so --

Q    Except for Officer Sharma, he's probably the only one who got it right.

A    I actually don't know if that's true in his IA,

of the crime doesn't slip through the cracks because you -- you know, you didn't write a thorough, accurate, complete report?

A    You do want to write a thorough, accurate, complete report.  The outcome of the trial is not up to the officer.

Q    That's for sure, but, you know, I guess, just from talking to you and asking you questions today, it doesn't seem to me that you think that Officer Sharma was trying to invent evidence to -- to put people in jail.

A    I don't think he was trying to invent evidence.

Q    This fourth paragraph, I find interesting.  And it deals with the mouth check errors, which we haven't talked about, but I -- they are part of the documentation that you have here.

He writes that Officer Sharma asked for a critique of his work in attempt to self-initiate in something, and that was discovered and he stopped making those mistakes.

Do you see that?  That as of January 2006, which is prior to any internal investigation, prior to Townsend, that he reviewed his reports with the prosecutor and the prosecutor found that and he stopped making the mistakes.

Are you aware of that?

A    Yes.

Q    Did you know which prosecutor that was?

A     I don't.

Q     And doesn't the fact that he's trying to self-initiate meetings to critique his reports show that he wasn't intentionally making any errors in his reports?

MR. LLOYD:  Objection; asked and answered.

THE WITNESS:  Errors?

Q     (By Mr. Blankenship) Yeah.  I mean, the fact that he's going to prosecutors and saying, Please take a look at my report and tell me what's wrong and how I can improve it, isn't that consistent with someone who is, you know, trying to write better reports and trying to make them complete and accurate?

MR. LLOYD:  Object to the form of the question.

THE WITNESS:  As a really general statement, I agree with that statement.

Q     (By Mr. Blankenship) And are you saying that specifically you don't think that's what Officer Sharma was doing?

A     I don't -- I don't know.  Again, there -- there seems to be -- errors would be corrected, there was a self-initiated -- self-initiated -- and I disagree with that general statement, as well.

Some of these where a prosecutor says, Can you fix this is not self-initiated.  But for the sake of argument, self-initiated to correct the errors after there had been

referred to as a templating issue, if that was causing all these other issues, errors, omissions and statements.

Q   Before we go there, let me just ask you this.  So it's true, though, that you never looked to see which ones -- I mean, you never checked the revocation hearing outcomes of Officer Sharma's and measured them against the other traffic officers?

A   Personally, no, no.

Q   But conceivably, you can look at those and see whether or not he has more revocations or less revocations than other officers, couldn't you?

A   Yes.

Q   You can establish what his record of revocations were versus his peers; right?

A   Yes.

Q   You said that after you learned about this templating issue with Officer Sharma you had -- you looked into other officers to see how they were doing; is that right?

A   I asked to have that done.

Q   Who did that?

A   I asked Commander Kistler to look into that.

Q   And did she prepare any type of report?

A   No.

Q   Did she verbally tell you what her findings were?

the Guild cannot understand the Department's action in this case.  It does not believe there is just cause for any discipline."

Obviously, you disagree with that, right, or you wouldn't be here?

A    Yes.  And I would expect the Guild to say that in virtually every case.

Q    Is that your experience, that they just basically stand behind the officer no matter what?

A    Not always, but generally -- in general terms, yes.

Q    And the last paragraph writes, "Given the fact that the department wished Officer Sharma to terminate his relationship with it a number of years ago as a result of his successful claim of discrimination, the Guild can only conclude that this action has all the trappings of retaliation for Officer Sharma's discrimination complaint."

Did I read that correctly?

A    You read that correctly.

Q    And it's true that you were aware that he had a claim of discrimination, and that he received money for it; correct?

A    And retaliation, was my understanding.

Q    Yes.

A    Yes; prior, yes.

Q    Let me -- let me ask you this:  At any point, did you perform some type of investigation to ascertain whether or not Officer Sharma had been discriminated against prior to his termination?

MR. LLOYD:  Object to form; vague as to time.

Q    (By Mr. Blankenship) Prior to Officer Sharma's termination, did you conduct any type of investigation looking into whether or not he had been discriminated against?

MR. LLOYD:  Same objection.

THE WITNESS:  In the prior case?

Q    (By Mr. Blankenship) In this case.

A    In this case?  No, no.

Q    Did you ever perform or know of anyone doing any investigation into whether or not he suffered retaliation in this case?

MR. LLOYD:  Object to the form of the question, it assumes facts not in evidence.

THE WITNESS:  Am I aware of an investigation being done?

Q    (By Mr. Blankenship) Yeah, right.  I mean --

A    No, I'm not.

Q    Because of the year, you would agree that this is a complaint by the -- by John Hoag on behalf of Officer Sharma that this looks like retaliation for his prior

discrimination complaints.

Do you see that?

A    Yes.

Q    And I just want to make sure that I understand your answer.  There was never any action there taken by you or anyone, to your knowledge, investigating the veracity of that claim, that this has the trappings of retaliation?

MR. LLOYD:  I'll object to the form of the question.

THE WITNESS:  I'm not sure what that investigation would be, but the answer is no, we did not investigate that.

Q    (By Mr. Blankenship) Did you respond to this letter by Mr. Hoag?

A    I -- I think not directly to the letter, but I responded and mentioned it in the letter of -- on the final letter.

Q    You ultimately drafted a document -- okay.  So you had a -- you wrote a final letter, the final discipline letter; right?

A    Yes.

Q    And who did you -- if I understand your prior testimony, you wrote it -- you started it, at least, on your own; right?

A    Yes.

Q    And you consulted with Terry Weiner and Debra

Q     (By Mr. Blankenship) Handing you what has been marked Exhibit 14, which appears to be the actual final draft of final discipline and termination employment of Navin Sharma, from you, dated September 20, 2006.

Is this a true and correct copy?

A     It appears to be.

Q     And with respect to Exhibit 13, is that a true and correct copy, as well?

A     Of?

Q     Of --

A     Of this draft?

Q     Yeah.

A     It appears to me to be.

Q     And is there anywhere in this final report where it states that Officer Sharma knowingly or intentionally made inaccurate statements in his reports?

A     That is not stated in those words in this document.

Q     Is there anywhere in this document that it says that Officer Sharma perjured himself?

A     That term is not used in this document.

(Deposition Exhibit 15 was marked for identification.)

Q     (By Mr. Blankenship) Handing you Exhibit 15, which I will represent was produced to us as being the personnel

REPORTER'S CERTIFICATE

STATE OF WASHINGTON       )
                          ) ss.
COUNTY OF CLARK           )


        I, PRISCILLA (PIA) HARRIS, a Certified Shorthand Reporter for Washington, do hereby certify that, pursuant to stipulation of counsel for the respective parties hereinbefore set forth, MITCHELL BARKER, personally appeared before me at the time and place set forth in the caption hereof; that at said time and place I reported in Stenotype all testimony adduced and other oral proceedings had in the foregoing matter; that thereafter my notes were reduced to typewriting under my direction; and that the foregoing transcript, pages 1 to 324, both inclusive, constitutes a full, true and accurate record of all such testimony adduced and oral proceedings had, and of the whole thereof.

        WITNESS my hand and CSR stamp at Vancouver, Washington, this 10th day of June 2008.



                        PRISCILLA (PIA) HARRIS
                        Registered Professional Reporter
                        Certified Shorthand Reporter
                        OR CSR No. 01-0377
                        WA CSR No. 2963




# NOTICE OF OFFICER HIRE / TERMINATION

| 1. HIRE | 2. TERMINATION |
|---|---|
| AGENCY: | AGENCY: **VANCOUVER POLICE** |
| OFFICER NAME: | OFFICER NAME: **SHARMA, Navin K.** |
| DATE OF BIRTH: ☐ FEMALE ☐ MALE | DATE OF BIRTH: ☐ FEMALE ☒ MALE |
| SOCIAL SECURITY : | SOCIAL SECURITY: ▮▮▮▮ |
| HIRE DATE: | HIRE DATE: **03-04-1997**    TERMINATION DATE: **09-21-06** |
| PREVIOUS EMPLOYER: | TERMINATION TYPE: ☐ RESIGNED ☒ INVOLUNTARY |
| DATES EMPLOYED: (from) (to) | ☐ MEDICAL ☐ RETIRED ☐ DECEASED |

**3.**    <u>This section (3) must be completed ONLY when reporting terminations.</u>
Is this agency aware of conduct that may violate RCW 43.101.105?

☒ *YES      ☐ NO

*If yes, you are required to provide a detailed description of the misconduct AND to complete items I and II below.*

*Section 43.101.010 of the Revised Code of Washington:*

*(7) "Discharged for disqualifying misconduct" means terminated from employment for (a) Conviction of (i) any crime committed under color of authority as a peace officer, (ii) any crime involving dishonesty or false statement within the meaning of Evidence Rule 609(a), (iii) the unlawful use or possession of a controlled substance, or (iv) any other crime the conviction of which disqualifies a Washington citizen from the legal right to possess a firearm under state or federal law; (b) conduct that would constitute any of the crimes addressed in (a) of this subsection; or (c) knowingly making materially false statements during disciplinary investigation, where the false statements are the sole basis for the termination.*

*(8) A peace officer is "discharged for disqualifying misconduct" within the meaning of subsection (7) of this section under the ordinary meaning of the term and when the totality of the circumstances support a finding that the officer resigned in anticipation of discipline, whether or not the misconduct was discovered at the time of resignation, and when such discipline, if carried forward, would more likely than not have led to discharge for disqualifying misconduct within the meaning of subsection (7) of this section.*

I. Officer's last known mailing address:

▮▮▮▮▮▮▮▮▮▮

II. Agency investigative contact person:
(name, phone, e-mail)

**LT. HARRY RUSSELL**    **360-696-8116**    harry.russell@ci.vancouver.wa.us

**4.** I declare under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct to the best of my knowledge.

<u>Appointing Official name & title</u> (PRINT PLEASE)
(Chief, Sheriff, Mayor, etc)

                         <u>E-mail address</u>

**MITCH BARKER, ACTING CHIEF OF POLICE**      vanpd@ci.vancouver.wa.us

| Signature of above | City | State | Date |
|---|---|---|---|
| *(signature)* | VANCOUVER | WA | 10/3/06 |

HIRE/TERMINATION 1110 CJTC
Revised October 2004



EXHIBIT NO. 4
6-2-08 SH
SCHMITT & LEHMANN, INC.



Personnel Action Report

## Separation/Termination

### WASHINGTON STATE CRIMINAL JUSTICE TRAINING COMMISSION
19010 1ˢᵗ Ave. S.  Seattle, WA  98148   Office 206-835-7310 Fax 206-439-3859

Last, First, Middle
Name: **ANDERSON, HOWARD C. JR**

| SSN: ▇▇▇▇▇▇▇ | AGENCY: **VANCOUVER POLICE** |
|---|---|
| HIRE DATE: **7-1-94** | SEPARATION DATE: **8-6-04** |

**Separation for any of the following reasons requires detailed information describing the act of disqualifying misconduct under RCW 43.101.010(7) or conviction of a felony crime.**

☐ **Resigned (or retired)** to avoid discipline for actions involving disqualifying misconduct.
☐ Termination for disqualifying misconduct.
☐ Conviction of a felony crime.

*PLEASE ATTACH ADDITIONAL INFORMATION AS NECESSARY*

## OTHER REASONS

| ☐ Voluntary | ☐ Administrative | ☐ Resignation |
|---|---|---|
| ☐ Disability | ☐ Retired | ☐ Deceased |
| ☒ Termination with cause not constituting disqualifying misconduct under RCW 43.101.010(7) | | |

**NOTICE:  Pursuant to RCW 43.101.135 an employing agency must notify the Washington State Criminal Justice Training Commission of the termination of a peace officer for any reason, including resignation, within fifteen (15) days of the termination.**

| Agency Administrator's Name & Title: | Todays Date: |
|---|---|
| BRIAN J. MARTINEK | August 9, 2004 |
| Agency Phone Number/Contact Person: | |
| DEBBY CAMPBELL/360-696-8271 | |

| Administrator's Signature: | E-mail address: |
|---|---|
| *[signature]* | vanpd@ci.vancouver.wa.us |

PDR 11/10/06
00020

Updated 5/2002
Form #1101

Please visit our website: www.cjtc.state.wa.us



Barker
EXHIBIT NO. 5
6-2-08 8+
SCHMITT & LEHMANN, INC.



# CITY OF VANCOUVER
# POLICE DEPARTMENT

P.O. Box 1995
Vancouver, WA 98668-1995



To:          Officer Navin Sharma

From:        Acting Chief Mitch Barker

Date:        August 8, 2006

Subject:     2006-061 Notice of Findings

The Professional Standards Unit has completed the internal investigation into the allegations of improper performance of duties regarding your reporting of DUI arrests and processing. This investigation was conducted to determine if there was compliance with Vancouver Police and City Policies. According to my records, you were offered the opportunity to review the file and submit a written response. You reviewed the file on two occasions but declined to provide a written response. If my records are incorrect, please notify me immediately.

During the course of this investigation Lieutenant Russell has kept me continually updated on its progress. I received this file on July 17, 2006 and have read the file in its entirety. Following this reading I directed Lt. Russell to obtain from you your copies of any field notes related to the cases in question, specifically regarding notes documenting Standardized Fields Sobriety Test (SFTS) and Horizontal Gaze Nystagmus (HGN) results. I received these notes on August 2, 2006 and have reviewed them in their entirety.

The following policies are cited in the Complaint summary. I have addressed each complaint and have listed my findings based on all the information I have been provided.

Department Policy 7.1.1, Statements/False Statements – **Sustained**

*The investigation produced sufficient evidence that you made false statements in your submitted reports.*

Department Policy 14.01.02, Completion of Reports – **Sustained**

*The investigation produced sufficient evidence that you failed to complete required reports in an accurate manner.*

COV_000028

---

Barker
EXHIBIT NO. 6
6.3.08 PH
SCHMITT & LEHMANN, INC.

**Department Policy 5.16, Incompetence – Sustained**

*The investigation produced sufficient evidence that you displayed a reluctance or inability to properly perform your assigned duties*

Additionally, pursuant to *Brady v. Maryland*, I am forwarding a copy of this Findings letter to both the Vancouver City Attorney's Office as well as the Clark County Prosecutor's office for a review and opinion from them as to the impact of this incident on your ability to testify in future criminal matters.

Based on these findings, and taking the totality of all the information presented to me into consideration, these sustained violations would support discipline up to and including termination.

Consistent with Vancouver Police Department's Internal Investigations policy, you have the opportunity to meet with me and your Commander prior to any decision on discipline being made. The purpose of this meeting is to allow you to present me with any information you feel may bear on what level of discipline, if any, should be imposed based on the findings set forth in this letter. If you are interested in exercising this right to a Loudermill Hearing, please contact Debby Campbell on or before August 25, to schedule this meeting. In addition, you have the right to have a union representative present during this meeting.

Please sign and return this copy to Lt. Russell acknowledging that you have received it. You may keep a copy for your records. If you have any questions or concerns regarding the finding on this investigation, please contact me directly.

_____          _____
Officer Navin Sharma                           Date

_____          _____ 8-8-06 _____
Acting Chief Mitch Barker                    Date

cc:     Cmdr. Nannette Kistler
        Debra Quinn, Law
        Sgt. Scott Creager, VPOG Representative
        City of Vancouver City Attorney's Office
        Clark County Prosecutor's Office
        File Copy

COV 000029



# CITY OF VANCOUVER
# POLICE DEPARTMENT

P.O. Box 1995
Vancouver, WA 98668 -1995



August 10, 2006

Mr. Art Curtis
Prosecuting Attorney
1013 Franklin Street
PO Box 5000
Vancouver WA 98666-5000

Mr. Ted Gathe
Vancouver City Attorney
210 E. 13th Street
P.O. Box 1995
Vancouver, WA 98668

RE: Navin Sharma

Dear Mr. Gathe and Mr. Curtis:

The Vancouver Police Department has completed an investigation of allegations made against Officer Navin Sharma. Specifically the allegations included Vancouver Policies of Statements/False Statements, Completion of Reports, and Incompetence. All allegations were sustained by letter on August 8, 2006. A copy of the Notice of Findings letter describing the above is being provided to you.

Based on the allegations, as well as the Notice of Findings letter, we are requesting you complete a review of the information and provide us with a written opinion as to the impact on Officer Sharma's ability to testify in future criminal matters, pursuant to *Brady v. Maryland.*



Barker

EXHIBIT NO. 7
6·2·08 BH
SCHMITT & LEHMANN, INC.

COV 000030

We request you provide us with this information on or before August 25, 2006. Should you have any questions, or wish to discuss this matter further, please feel free to contact me.

Very truly yours,

Mitch Barker
Acting Chief of Police

Cc:    Off. Navin Sharma
        Jim Miller, Clark County Prosecuting Attorney's Office
        Kevin McClure, Vancouver City Attorney's Office
        Debra Quinn, Law
        Scott Creager, VPOG
        File

COV 000031

_|&|x|

File Edit View Insert Format Tools Table Window Help

Normal • Times New Roman • 12 •

# CITY OF VANCOUVER
# POLICE DEPARTMENT

P.O. Box 1995

Vancouv...

**Document Properties dialog:**

General | Summary | Statistics | Contents | Custom |

Title:

Subject:

Author: Debra Quinn

Manager:

Company: City of Vancouver

Category:

Keywords:

Comments:

Hyperlink base:

Template: Normal.dot

☐ Save preview picture

[ OK ] [ Cancel ]

August 10, 2006

Mr. Art Curtis
Prosecuting Attorney
1013 Franklin Street
PO Box 5000
Vancouver WA 98666-5000

Mr. Ted Gathe
Vancouver City Attorney
210 E. 13th Street
P.O. Box 1995
Vancouver, WA 98668

RE:    Navin Sharma

Dear Mr. Gathe and Mr. Curtis:

The Vancouver Police Department has completed an investigation of allegations made
against Officer Navin Sharma. Specifically the allegations included Vancouver Policies

Page 1    Sec 1    1/2    At 2.8"    Ln 10    Col 1    REC TRK EXT OVR    3:40 PM

Start ... Z:\Clients-Current\H - S\... D:\Deprivileged\Barker ... Prosecutor Cover Let...


Barker
EXHIBIT NO. 8
6-2-08
SCHMITT & LEHMANN, INC.

RECEIVED

AUG 3 0 2006

OFFICE OF THE CHIEF
VANCOUVER POLICE

# SNYDER & HOAG LLC

Kathleen Pearson, Paralegal

August 28, 2006

*COPY*

Mitch Barker
City of Vancouver
Police Department
P O Box 1995
Vancouver, WA 98668-1995

### RE:  Your Letter Dated August 18, 2006 Concerning Charges
### Brought Against Officer Navin Sharma

This letter is being written on behalf of the Vancouver Police Officers' Guild and Officer Navin Sharma, responding to the charges that have been made against him. Because your above referenced letter is the only one that has any specificity in it, I will attempt to respond on the Guild's and Officer Sharma's behalf in the same order that you raised specific allegations of misconduct. Officer Sharma will not appear in person at a *Loudermill* hearing because it is clear than any effort on his part to have a discussion with you would be futile. He will testify in detail at arbitration just as he gave a detailed statement during the internal investigation, and the Guild is confident that since there is no just cause for discipline, that he will be reinstated as a police officer.

Before making specific responses, the following overview is in order:

Officer Sharma has worked for the Vancouver Police Department for approximately nine and one-half years. When the Department saw fit to do evaluations, the ones he received were highly positive and were from those most familiar with his work: his immediate supervisors. He has never been subject to discipline. He has received awards, almost too many to list, including, but not limited to the Clark County DUI Task Force Exceptional Law Enforcement Award for Outstanding DUI and Traffic Enforcement in 2003, 2004,and 2005. He has received numerous compliments from the City Attorney's Offices for his work on DUI cases, including some of the same cases in which you are claiming that he made egregious mistakes. Also in his file are numerous compliments from citizens and supervisory members of this Police Department.

Most importantly, during his career, Officer Navin Sharma's integrity has *never* been questioned.

Officer Sharma has always prided himself in high quality work. Since assigned to the Traffic Team, between April 2002 and March 2006, he made approximately 13 self-initiated contacts with the City Attorney's office working with various Assistant City



Mail correspondence to: PO Box 42021· Eugene, Oregon 97404
Eugene, Oregon 97404 · (541) 342-8100
Fax: (541) 342-8567 · E-mail – jhoag@snyderandhoagllc.com

COV 000039

Attorneys to improve his DUI reports. It was through their suggestions that he standardized many of the items in his reports, trying to use consistent language and descriptions that would be in accord with State DUI arrest forms.

With this emphasis on consistency and standardization, it certainly does follow that if mistakes or errors were made, then they would be repeated until discovered. That is in fact what occurred here.

Turning to the specifics in page 2, of your letter, the responses are as follows:

1. First paragraph. If every officer who made a statement in a police report that was later determined to be inaccurate were told that he or she falsified a document, or somehow committed perjury, the Vancouver Police Department would be significantly smaller in size. The Guild also notes with some cynicism, that while you started out quoting that statement, you had to conclude at the end of that page, that there is no evidence whatsoever in the record that Officer Sharma intended to make any statement that was inaccurate.

2. Second paragraph. Officer Sharma did include standard language regarding the temperature testing of the breathalyzer machine. Contrary to your assertion, the record is clear that he did perform this step. He had to have performed this step, or the machine would not have functioned and produced a DUI result with a printout. What he did not do was look at the exact internal verifier reading and record that number. He continued with this practice, because the error was never discovered by his supervisors, by City prosecutors, or by a defense attorney. This error never compromised any case. In addition, the machine prints out the temperature from the internal check when it gives a breathalyzer reading. If this is such a critical step, the Vancouver City Attorneys who prosecuted his cases should have easily caught it, as should have his supervisors.

3. Third and fourth paragraphs. You mentioned that the Department reviewed 160 of Officer Sharma's reports. You do not mention how many of those reports included inaccuracies, and more importantly, how many of those inaccuracies were critical as opposed to inadvertent errors in cutting and pasting. Not one error was the result of Officer Sharma trying to conjure up evidence in order to make a case against a defendant.

4. Turning to the fifth and sixth paragraphs, Officer Sharma did not make errors in his mouth check of observation times. He did make errors recording the right time in the right place. This error and the issue that you next mention regarding the information to drivers regarding the failure of taking a breathalyzer, was brought to his attention by prosecutors in a self-initiated meeting that Officer Sharma had with them in January 2006, when he asked for a critique of his work. As a result of that meeting, those mistakes ceased.

COV 000040

5. Seventh paragraph. The only pattern that one can point to here with certainty is that Officer Sharma took painstaking steps over the years to attempt to, improve the quality of his DUI reports. His reports establish that he was successful in this effort. He worked closely with the prosecutor's office in doing so. There is not one scintilla of evidence anywhere in the IA file showing that Officer Sharma intended to falsify anything.

6. Last, you have tried to boot strap a case by attempting to get Prosecutors to declare that they will never use Officer's Sharma's testimony in court. The Clark County Prosecutor's Office didn't make that declaration. The only way that your attorney could reach such a conclusion was to equate making a false statement under oath in order to get welfare benefits with the facts in this case. An Arbitrator will reject such an illogical analogy. After all this case will center on whether there is just cause for discipline and not what you can convince an attorney to say.

In summary, the Guild cannot understand the Department's action in this case. It does not believe there is just cause for any discipline. At most what occurred were self-corrected errors that might reasonably be utilized as a training device, but do not support discipline or discharge.

Given the fact that the Department wished Officer Sharma to terminate his relationship with it at number of years ago as a result of his successful claim of discrimination, the Guild can only conclude that this action has all the trappings of retaliation for Officer Sharma's discrimination complaint. It is very unfortunate that you and the City of Vancouver have chosen to take the actions that you are taking in Officer Sharma's case, which will undoubtedly cause a re-visiting of that issue.

Sincerely,

Snyder and Hoag, LLC

John Hoag
Attorney

JH:jlp

cc: Officer Navin Sharma
    Scott Creager, VPOG President
    Jeff Olson, VPOG Representative
    Art Curtis, Clark County Prosecuting Attorney
    Ted Gathe, City Attorney

COV 000041





# CITY OF VANCOUVER
# POLICE DEPARTMENT

P.O. Box 1995
Vancouver, WA 98668 -1995

To:         Officer Navin Sharma

From:       Acting Chief Mitch Barker

Date:       September 20, 2006

Subject:    2006-061 Final Discipline – Termination of Employment

At my direction, the Professional Standards Unit completed an internal investigation into the allegations of improper performance of duties regarding your reporting of DUI arrests and processing. This investigation was conducted to determine if there was compliance with Vancouver Police and City Policies. On August 8, 2006, I forwarded to you a letter of my findings and potential disciplinary outcome. Via legal counsel, you advised me that the original findings letter lacked the specificity to properly respond. On August 18, 2006, I forwarded to you a second letter which provided more specific information to assist in your response. At that time I offered you the opportunity to meet with me and bring forward any other information you wanted me to consider prior to imposition of any final discipline. Through your legal counsel you declined that hearing process but did provide, in a letter dated August 28, 2006, responses to the letter of findings.

In your letter, your counsel stated you would not attend the hearing because, he concluded, "it is clear" that an attempt to discuss this situation with me would be "futile." I am at a loss as to how he arrived at that conclusion having never discussed this situation, or any other situation, with me in the past. It is unfortunate that he chose to erroneously pre-judge the process, causing you to forgo an opportunity to provide me, in person, with information you may consider relevant to this discipline issue. As a result, I have made my decision on final discipline based on a review of all information that has been presented to me to this point, including the entire IA 2006-61 file, your personnel file, correspondence with both the City Attorney's Office as well as the Clark County Prosecuting Attorney's Office and Mr. Hoag's August 28, 2006 letter.



Barker
EXHIBIT NO. 14
6-2-06
SCHMITT & LEHMANN, INC.

The following policies were cited in the Complaint summary. As previously communicated, I addressed each complaint and arrived at the following findings:

Department Policy 7.1.1, Statements/False Statements – **Sustained**

Department Policy 14.01.02, Completion of Reports – **Sustained**

Department Policy 5.16, Incompetence – **Sustained**

In determining what level of discipline to impose, I considered a wide range of factors, including the comments of Mr. Hoag, on your behalf, in his August 28, 2006 letter. I will attempt to respond to his relevant comments, as I outline my decision making process. The absence of response to any of his other comments, however, should not be mistaken for my agreement with them.

First, this investigation was initiated as a response to a defense attorney suggesting that you were engaging in a pattern of "recycling" prior case reports and therefore including information that was not accurate to specific cases. Commander Nannette Kistler initially was very skeptical of this claim and suggested that the claim was likely unfounded. However, pursuing due diligence, she reviewed a representative sample of approximately 35 case reports and found that a number of them appeared to be copied from a single set of facts, that they contained a number of errors, and that the original claim may have merit. This investigation was not, as Mr. Hoag suggests, some form of retribution for past disagreements with the City. A disagreement, I should point out, in which I had no part and for which I was not even with the agency when it occurred.

Once the information of the initial assessment was conveyed to me, I directed the investigation be commenced as required by policy. In order to provide as fair a review as possible, approximately 158 DUI case reports were drawn for review. Of those case reports, 116 contained errors. This is not an issue of a mistake or two, or of a random typographical error. Additionally, this is not an issue of an error in an internal document or record. This is a case of numerous errors contained in official documents filed with the court that have an impact on people's lives. I am well aware of, and certainly understanding of mistakes made in reports. Mistakes will be made by all of us at times and there is a level of tolerance that most people can agree upon. This investigation shows you were clearly beyond the line of acceptable, random mistakes. Of the flawed cases reviewed, some contained single errors; others contained a variety of errors ranging from minor to significant. Significant errors included, but were not limited to, improper mouth check times, improper and erroneous statements to suspects of the need to perform field sobriety tests, and a false statement that you checked the temperature of the external BAC standard when in fact you did not. Each of these errors could be cause for dismissal of the criminal case as well as the license revocation hearing. As reviewed in the IA materials, several DUI suspects were, in fact, successful in having their license revocations dismissed because of your errors in the reports.

COV 000019

2

Second, I looked to the likely harm your violations have and will cause to past and pending cases. A number of the pending DUI cases will now likely be compromised and/or dismissed. Additionally, a number of prior pleas and convictions have now been put at risk. As I informed you, I felt obligated to share my findings with the prosecuting authorities in the city and county who are charged with taking our information forward through the legal process. As you have read in their response letters to me, they will now need to disclose the information from this investigation whenever you are scheduled as a witness in a future court proceeding. The City Attorney's Office is already in the process of making these "Brady disclosures" in several pending cases, and will also have to make the same notification to many of the defendants you arrested in prior DUI cases. Although, as Mr. Hoag points out, the prosecutors do not *categorically* state that they will not prosecute future cases wherein you are a witness, they also cannot state that they will prosecute those cases. Once the "Brady disclosure" is made, it will be up to the judge to decide whether the findings in this IA will be disclosed, and whether counsel would be allowed to cross-examine you regarding the issues that led to the sustained findings. The prosecutor will then be placed in the precarious position of trying to rehabilitate you on the witness stand. This creates an unacceptable risk that criminal prosecutions will be jeopardized. As you know police officers are held to a higher standard of conduct. It is necessary for the public to have complete and total confidence in the trustworthiness and integrity of its police officers. Violating or undermining this public trust and confidence has a negative impact on the reputation of the entire municipality and has a crippling effect on its ability to effectively carry out the responsibilities it was created to perform.

It is a virtual certainty that at the very least your credibility will be called into question by defense counsel on future cases in which you are the arresting officer or a critical witness to the events. At worst, the prosecutor may have to dismiss cases you are involved in because of the credibility issue, thereby impeding effective law enforcement in the City. This would obviously impact your ability to perform one of the basic functions of a police officer – to testify credibly in front of a judge and jury.

Third, I reviewed your personnel file and looked at your past record with the department. As indicated, you have a very good record with the department. I am aware that you have received numerous letters of thanks and commendation from both within and outside the department. Your work in the field of domestic violence was noted to me by a member of the City Attorney's Office and I am personally aware of all the work you have done with the TEMS Unit. Your record of service in the past is not in question nor am I attempting to disparage your character in any manner.

Fourth, I looked to the comments about others being responsible for not learning of these errors earlier and that others are somehow responsible for your actions in these reports. While there may be some blame, if you wish to share it, with others in the system, you must ultimately be held accountable for your actions. Certain assumptions are made when reviewing officers' reports. Those assumptions include a belief that the officer is making factually correct statements, that the officer has reviewed the report for accuracy, and that the facts stated are specific to that particular case and not reused from a similar, yet different case. Those assumptions are made more readily when the reporting officer is, like you, a veteran officer

COV 000020

3

reporting in an area of expertise specific to his work assignment. In order to have caught these errors, one would have needed to review them in context with a large number of prior reports. That, in my opinion, is not reasonable for supervisors reviewing hundreds of reports every month or for prosecutors reviewing thousands of reports every year. This investigation was able to document your policy violations only after a thorough review of *all* your DUI reports over the past few years, not just a select few.

You also contend that the "mistakes" were made somehow as a result of meeting with the prosecutors in an attempt to improve your reports. However, I found no evidence in your statements or in any of the reviewed e-mails to or from the prosecutors where anyone suggested you template case facts and cut and paste them into subsequent reports, or that you add phrases that explain actions that were not taken. Likewise, it was not the prosecutors who suggested you make erroneous statements to suspects about being required to take FST's or face automatic revocation of their drivers license.

It appears that you developed a system to shortcut the diligent work needed to be completed when reporting these types of cases. As a result, a large number of the reports contained numerous factual errors. These errors were repeated because of your continuing failure to ensure the accuracy of your work.

In addition, you stated in approximately 80 cases that you performed a check of the external standard temperature, when you in fact did not do so. You clearly stated in your interview that this statement was added in an effort to include some verbiage about the operation of the BAC Verifier and that you took it from another officer's report. Mr. Hoag states in his response letter that you did perform this step because if you hadn't the machine would not have functioned. That is not correct. More importantly, the internal functioning of the BAC Verifier is not at issue here. The issue is your statement in those 80 cases that you performed a task that you did not do. By your own admission when interviewed you did not perform this step, added the statement, and then replicated it in what you termed "an unfortunate cut and paste error."

In conclusion, I have carefully reviewed and considered all information brought to me in this situation. I have given long thought to a means to remediate this situation in the best interest of both you and the department. In the end I am left with the strong belief that your reporting of the cases reviewed was done in a reckless manner. Taken together with the undisputed conclusion that the county and city prosecutors will now need to make Brady disclosures in all of your cases, it is my opinion that your policy violations were significant, reckless and repeated, and will render you unable to testify in future cases where you are the sole or primary reporting witness. The ability to testify as a credible witness in court is an essential job requirement for the position of police officer within the Vancouver Police Department. Whether final discipline rests solely with your writing reports in violation of department policy or with the conclusions of the prosecutors' offices, I find either reason serves as a basis for separation of your employment.

Therefore, effective September 21, 2006, I am terminating your employment as a police officer with the Vancouver Police Department.

4

COV 000021

In the event you wish to appeal this decision, you may do so as provided in Section 28.2 of the Collective Bargaining Agreement by providing me with notice within ten (10) days of the date of this letter.

Please sign and return this copy to Lt. Russell acknowledging that you have received it. You may keep a copy for your records.

_____     _____
Officer Navin Sharma                        Date

_____     _____9-30-06_____
Acting Chief Mitch Barker                    Date

cc:     Cmdr. Rick Smith
        Debra Quinn, Law
        Terry Weiner, Law
        Sgt. Scott Creager, VPOG Representative
        Personnel File
        File Copy

COV 000022

5